UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHD MICHIGAN, L.L.C., et al.,

    Plaintiffs,

v.

OUTFITTERS ASSOCIATION OF AMERICA,
et al.,

    Defendants.
    _____/

Case No. 04-73964

Honorable Nancy G. Edmunds

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [54] AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT [64]**

    This action comes before the Court on the parties' cross-motions for summary judgment. Plaintiffs PHD Michigan, L.L.C. ("PHD") and DaimlerChrysler Motors Co., L.L.C. ("Chrysler") brought this action against Defendants Outfitters Association of American ("Outfitters"), WP Productions, and Wayne Pearson, and Defendants subsequently filed a counter-complaint. Plaintiffs First Amended Complaint alleges claims for breach of contract, unjust enrichment, fraud, civil conspiracy, conversion, and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(1). Defendants' Second Amended Counter-Complaint alleges claims for breach of contract (Counts I and II), punitive damages (Count III), and unjust enrichment (Count IV).

    Defendants seek partial summary judgment in their favor on Plaintiffs' claims for breach of contract, fraud, conversion, unjust enrichment, and RICO. Plaintiffs seek summary judgment in their favor on all claims asserted in their Complaint. For the reasons

stated more fully below, this Court GRANTS IN PART AND DENIES IN PART Defendants' motion for partial summary judgment and Plaintiffs' cross-motion for summary judgment.

**I.   Facts**

Defendant Wayne Pearson has been the president of WP Productions since its inception in 1980.  WP Productions is in the business of producing television shows on ESPN2:  Ultimate Outdoor Adventure and Outfitters Almanac.  Pearson is involved with marketing and promoting these cable shows.  (Pearson Aff. ¶¶ 1, 4.)

In 1999, he formed the Outfitters Association of America ("OAOA") so that members would have an avenue for advertising and keeping up with new ideas in the industry and the general public would have a means to research and find OAOA members.  (Pearson Aff. ¶ 3.)  OAOA also certifies its members as "outfitters" and guides, and the states of South Dakota and New Mexico currently endorse OAOA as a certifying agent for "outfitters" or guides working in those states.  (*Id.*)

In the summer of 2000, Pearson met with representatives of DaimlerChrysler to pitch a marketing and sponsorship program between WP Productions and DaimlerChrysler where Dodge would be marketed and promoted as the exclusive vehicle of the OAOA.  The Dodge truck would be featured on Defendants' cable shows and advertised during the programming, and Dodge would be the main sponsor of the OAOA "Outfitters Almanac" and would have a banner and advertising on the OAOA website.  (Pearson Aff. ¶ 5.)

The parties' contract is evidenced by a January 17, 2001 letter, (Pls.' Ex. A) that provides details of the agreement between Plaintiffs and WP Productions.  As to the Outfitters Almanac or Directory, the letter states that Defendant WP Productions was to provide:

- 200,000 copies per year
- Dodge advertising on the 2nd cover spread/4th cover and center spread
- Automotive exclusivity
- BBDO creative input and approval

(*Id.* at 2.)   Plaintiffs were to pay Defendant $600,000 as follows:

- $100,000 payable October 2000.
- $100,000 payable January 15th 2001.
- $400,000 payable February, 2001
- The OAOA will return $1.00 for each Almanac sold to Dodge

(*Id.*)  Plaintiffs also agreed to pay Defendant $658,000 per year for broadcasts, to be paid in "[e]qual monthly increments of $54,833.33 beginning January 30th - December 31st 2001-2003." (*Id.*)  As to internet services, Plaintiffs agreed to pay Defendant $150,000 per year paid in "[e]qual quarterly increments of $37,500 beginning March 31st, 2001; June 30th; September 30th, December 31st 2001-2003." (*Id.*)

The contract term was for 2001, with a renewal option for 2002 and 2003 to be made by July 31, 2001.  (*Id.*)

Plaintiffs paid Defendant WP Productions $3,100,000 under this contract, as follows:

```
         2001
$  658,000    Television
   600,000    Almanac
   150,000    Online
$1,480,000    Total

         2002
$  658,000    Television
   600,000    Almanac
   150,000    Online
$1,480,000    Total

         2003
$  219,333    Television
   100,000    Almanac (pre-paid 10/02)
       -0-    Online
$  319,333    Total
```

(Pls.' Ex. B, OAOA Payment History; Defs.' Ex. P, 4/16/03 Letter; Pearson Aff. ¶ 32.)

In late January 2001, Pearson attests, Plaintiffs told WP Productions and OAOA that Plaintiffs would not be distributing the Almanacs. (Pearson Aff. ¶ 12.) WP Productions' and OAOA's acceptance of this responsibility is acknowledged in a April 17, 2003 letter. (Pls.' Ex. F at 1, "Although unprepared for this task, OAOA gladly accepted the additional responsibility and expenses of this development.").[1]

After the contract was entered into, WP Productions and OAOA hired three people, Dan Hogan, Tom Floyd, and Mike Harris, to run the account and hired twelve field representatives to create the Outfitters Almanac. These field representatives were responsible for contacting and investigating "outfitters" or guides to be listed in the Almanac. (Pearson Aff. ¶¶ 9-10.)

One of those employees, Mike Harris, made the decision to initially print 100,000 rather than 200,000 Almanacs due to distribution and storage difficulties. (Pearson Aff. ¶

---

[1] On April 17, 2003, Wayne Pearson wrote to James Schroer, Executive V.P. Global Sales & Marketing at DaimlerChrysler. Despite claims asserted now, that letter acknowledged that distribution of the Outfitters Almanac was Defendants' responsibility and that Defendants had accepted that responsibility along with its additional expenses:

> When we entered into our Dodge/OAOA agreement, which called for the publishing of a 400-page "Outfitters Almanac" printed directory, we were promised that Dodge would handle the distribution of these books through their dealership network. Subsequently, after the books were already in production, this decision was changed, and the distribution of books became the responsibility of OAOA. Although unprepared for this task, OAOA <u>gladly accepted the additional responsibility and expenses</u> of this development. (Emphasis added).

(Pls.' Ex. F, 4/17/03 Pearson letter at 1.)

4

13.) WP Productions was able to distribute approximately 80,000 Almanacs in 2001. (*Id.* at ¶ 19.) In 2002, 100,000 Almanacs were printed and 200,000 CDs were prepared. WP Productions and OAOA distributed 90,000 printed Almanacs in 2002 and approximately 100,000 CDs. (*Id.* at ¶ 20.) About 30,000 Almanacs were intentionally destroyed (by burning) in 2002. (*Id.* at ¶ 22.)

With regard to WP Productions' contractual obligations concerning Dodge advertising on the OAOA website, Pearson attests that WP Productions monitored the amount of web traffic and found it to be greater than the 7.5 million hits or impressions guaranteed by the contract. (Pearson Aff. ¶ 24.)

An affidavit by William Shiver, a WP Productions employee who worked with the OAOA website, attests that the Dodge banner was not received from PHD until late April 2002 and was on a Double Click system. (Doc. 80, Pls.' Ex. 16, Shiver Aff. ¶¶ 2-3.) He further attests that although the viewer could access the Dodge website by use of the six Dodge icons on the OAOA site, the Double Click system did not count these impressions or the banner created by OAOA and used for 16 months. (Shiver Aff. ¶ 4.) Mr. Shiver ran a monthly report based on the impressions on the server and believed that Dodge was receiving the guaranteed 7.5 million web impressions. (*Id.* at ¶¶ 5-6.) He advised Hogan of OAOA of this in February 2003 when he learned that Dodge was questioning the number of impressions received. He further attests that this was the first time Dodge requested an independent audit. (*Id.* at ¶ 6.)

With regard to contractual obligations for Dodge advertising on the cable shows, Pearson attests that WP Productions and OAOA were unaware of any problems. In fact, at the time the contract was terminated by Plaintiffs, all advertising had been produced for

5

that year's season on cable. (Pearson Aff. ¶¶ 24, 27.)

On April 16, 2003, Denise Smith, Sr. V.P. Director – Dodge Planning, wrote to Wayne Pearson at WP Productions informing them that the "Dodge will not be renewing the contract with Wayne Pearson Productions and the "Dodge Outfitters Association of America" for the 2004-2006 calendar years." (Defs.' Ex. P, 4/16/03 letter.) As to final payments for the 2003 calendar year, Ms. Smith informed Pearson that: "Dodge estimates an underdelivery of approximately 5,500,000 impressions and to date the O.A.O.A. website is still not audited by a third party audit service. The total cost for the Internet was $150,000 net of which Dodge will pay $40,000 for the 2,000,000 impressions that were delivered." (*Id.*)

Ms. Smith further informed Mr. Pearson that "Dodge will not be participating in the O.A.O.A. Almanac/CD-Rom in 2003" but would continue "to honor the contract for the 2003 calendar year" for the cable buy and would pay $658,000. (*Id.*) Thus, Dodge stated it would pay WP Productions for the 2003 calendar year: $658,000 for the cable buy and $40,000 for the Internet services. Since it had already paid $100,000 as pre-payment for Almanacs in October 2002 and had paid $219,333 on the cable buy, the remaining $378,667 would be paid "in equal monthly installments of $47,333.38 against the cable buy beginning with the May invoice, unless another advertiser purchase[d] the program." (*Id.*)

Pearson attests that, even though Plaintiffs told him that they would do so, they did not pay for the benefits of three months of advertising on the website and advertising for the entire 2003 season on the cable shows. (Pearson Aff. ¶ 32.)

Pearson further attests that Plaintiffs were billed $100,000 for prep work done in connection with printing the 2003 Almanacs (that were never actually printed). (Pearson

Aff. ¶ 42.)

Plaintiffs filed this action in October 2004. Plaintiffs' amended complaint alleges the following. In 2000 and thereafter, Plaintiffs entered into agreements with Defendants where Defendants agreed, among other things, to develop, print, and distribute Outfitters Almanac Directories ("Outfitters Almanac") in 2001, 2002, and 2003. Defendants also agreed to design a web page to promote Dodge and guaranteed 7.5 million impressions, hits, or visits on the Dodge web site for each year of the agreement. (Pls.' First Am. Compl. ¶¶ 10-12, 15.) The digest-size Outfitters Almanacs were to include several pages of Dodge advertising. (*Id.* at ¶ 14.)

Defendants promised and told Plaintiffs, at various times, that they had distributed 200,000 print copies of the Outfitters Almanac during the year 2001, had distributed 200,000 print copies and 100,000 CD roms of the Almanac during the year 2002, and had printed Outfitters Almanacs for the year 2003. (*Id.* at ¶¶ 16-18.) In exchange for Defendants' performance and in reliance on Defendants' representations, Plaintiffs paid Defendants more than $3 million. (*Id.* at 19.) Defendants, however, did not print or distribute hundreds of thousands of the Outfitters Almanacs as they represented. (*Id.* at ¶ 20.) Rather, Defendants intentionally destroyed Outfitters Almanacs they said they had or would distribute. (*Id.* at ¶ 21.) Defendants only printed 100,000 Outfitters Almanacs in 2001 and 2002 and distributed only a very small portion of that 100,000. They also failed to distribute the CD rom versions as promised, and intentionally engineered the web site to misrepresent the number of visits to the Dodge web page. (*Id.* at ¶¶ 22-24.)

Defendants' counter-complaint similarly alleges that they contracted with Plaintiffs in 2001, 2002, and 2003 for advertising and promotion services. (Defs.' 2d Am. Compl. at ¶

4.) Defendants then allege that Plaintiffs "decided not to participate in the Almanac/Compact disc distribution part of the parties' contract" but "agreed to continue with certain advertising on ESPN" on certain shows Plaintiffs produced. Defendants were to pay Plaintiffs $47,333.38 for this "cable buy" and have failed to do so. (*Id.* at ¶¶ 5-6, 8, 10.) Defendants further allege that Plaintiffs have not paid for services they requested and Defendants provided in 2000 to 2003. (*Id.* at 13.)

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

This matter is presently before the Court on Defendants' motion for partial summary judgment arguing that Plaintiffs' claims for fraud, conversion, unjust enrichment, and RICO should be dismissed and Plaintiffs' cross-motion that they are entitled to summary judgment on each of the claims asserted in their First Amended Complaint. The Court begins by analyzing Plaintiffs' breach of contract claims.

### A. Breach of Contract Claims

Plaintiffs argue here that Defendant WP Productions breached the parties' contract when it failed to print the promised 200,000 Almanacs in 2001 and 2002 and either did not distribute or destroyed some Almanacs that were printed. Defendants do not argue that there was no breach. Rather, Defendants argue that there was no contractual obligation to distribute the Almanacs. Even if true, this does not alter the fact that Defendant WP Productions breached its contractual promise to print 200,000 copies of Almanacs although it billed and received payment for the full 200,000 copies in both 2001 and 2002.

Defendants admit that WP Productions only printed 100,000 Almanacs in 2001. (Defs.' Ex. A, Wayne Pearson Aff. at ¶ 13; Defs.' Resp. at 4.) WP Productions similarly admits that it failed to print 200,000 Outfitters Almanacs in 2002: "In 2002, 100,000 books were printed and 200,000 CDs were burned." (Pearson Aff. at ¶ 20.) It further admits that some printed Almanacs were destroyed. "Eventually, about 30,000 almanacs were burned in 2002. In rural Georgia, the best method of disposal is by burning." (*Id.* at ¶ 22.) Despite

9

Defendants' admission that less than the contracted for amount of Almanacs were printed, Plaintiffs paid WP Productions $600,000 to print 200,000 Almanacs for calendar years 2001 and 2002. (Pls.' Ex. B, Invoices and Payment History.) No material facts are in dispute as to WP Productions' breach of the parties' contract. Plaintiffs are thus entitled to summary judgment as to WP Productions' breach of the subject contract.

Questions of material fact do exist, however, as to the damages owed for WP Productions' breach. Defendants argue that Plaintiffs received their bargained-for cable advertising, yet failed to pay the full amount owed for these services. Defendants further argue that, despite the promise in the April 16, 2003 letter, Plaintiffs never paid the $40,000 for four months of Internet services in 2003. (Defs.' Reply at 1; Defs.' Ex. P, letter.) Finally, as to the Almanacs, Defendants argue that Plaintiffs paid $1.3 million: $600,000 in 2001; $600,00 in 2002; and $100,000 in 2003. Defendants further argue that, at most, they failed to print and distribute 27,000 books for 2001 and 2002, thus entitling Plaintiffs to $181,000 (27,000 x $3 plus $100,000 paid in 2003).[2]

### B. Plaintiffs' Tort Claims

Defendants next argue that Plaintiffs' tort claims must be dismissed. Under Michigan law, Defendants argue, there can be a tort action only if it is shown that Defendants

---

[2]Although plead as breach of contract claims (2nd Am. Counter-Compl., Counts I and II), Defendants, in essence, assert an affirmative defense to Plaintiffs' breach of contract claims seeking an offset of Plaintiffs' alleged damages for amounts Defendants claim Plaintiffs owe them under the contract. (Defs.' Ex. P, 4/16/03 letter.)

As discussed above, this Court concludes that Defendants have breached the parties' contract, but genuine issues of material fact exist as to the amount of damages owed to Plaintiffs for this breach, including the amount Defendants may offset for money owed them under the contract.

10

breached a duty that exists independent of and apart from the subject contract. Defendants are correct.[3]

The Michigan Supreme Court recently observed that "a tort action will not lie when based solely on the nonperformance of a contractual duty." *Fultz v. Union-Commerce Associates*, 683 N.W.2d 587, 591 (Mich. 2004)(citing *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956)). In *Fultz*, the Court refined the analysis for determining whether a defendant's conduct gives rise to both a tort and a breach of contract action. "Specifically, the threshold question is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations. If no independent duty exists, no tort action based on a contract will lie." *Id.* at 592.

Applying that analysis here, this Court examines Plaintiffs' tort claims, beginning with its fraud claims based on false representations, failure to disclose facts, and bad-faith promises. It then discusses Plaintiffs' civil conspiracy claims alleging that Defendants "acted tortiously pursuant to a common design and overall scheme to defraud" Plaintiffs. (Pls.' Am. Compl. ¶¶ 48-50.)

### 1. Fraud Claims

To constitute actionable fraud, Plaintiffs must show:

(1) that defendant made a false representation;

---

[3] Although Defendants mistakenly analyze this issue by applying the economic loss doctrine, the result they advocate is correct.

11

(2) that it was false;
(3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion;
(4) that he made it with the intention that it should be acted upon by plaintiff;
(5) that plaintiff acted in reliance upon it; and
(6) that he thereby suffered injury.

*Hi-Way Motor Co. v. International Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) (citations omitted). As to the first element, Michigan law recognizes, as a general rule, that fraud claims cannot be based on a promise to do something in the future or the nonperformance of that future promise. "[F]raudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Id.* There is a "bad faith" exception to this general rule. To succeed on such a claim, a plaintiff must present evidence that, at the time the defendant made the promise to perform, it had no intent to fulfill that promise. A "fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Id.*

To support their fraud claims, Plaintiffs present evidence here that: (1) in January 2001, Defendants wrote that they were "happy to print and market all 200,000 of the almanacs to [their] retail partners" and they would share the revenue with Plaintiffs (Pls. Ex. D, 1/05/01 email); (2) Defendants invoiced and were paid by Plaintiffs for production and distribution of 200,000 Outfitters Almanacs in 2001 and 2002 and now admit that not all 200,000 were printed or distributed (Pls.' Ex. B, invoices; Defs.' Ex. A, Pearson Aff. at ¶¶ 13, 20, 22.); (3) Defendant Pearson misrepresented that WP Productions had printed and distributed 200,000 Almanacs (Pls.' Ex. F, 4/17/03 Pearson Letter at 1); and (4) Plaintiffs relied on those misrepresentations and paid Defendants for services they did not perform

12

(Pls.' Ex. B, invoices).

Analyzing Plaintiffs' evidentiary support and applying the principles of Michigan law set forth above, this Court concludes that Plaintiffs' fraud claims must be dismissed. First, there is no evidence supporting a fraud claim under the bad faith exception; i.e., that Defendants made a promise with no intent to perform that promise.

Second, there is no evidence supporting a general fraud claim. The January 2001 email (Pls.' Ex. D) addresses future promises in the parties' contract and thus cannot form the basis of a fraud claim. The 2000-2002 invoices were for contract services to be rendered in the future, not for past services and thus cannot form the basis of a fraud claim (Pls.' Ex. B). Likewise, the "New Vendor Authorization" form signed by Defendants on May 22, 2002 (Pls. Ex. I), contains future promises to perform all services under the parties' contract at the "highest level of integrity" and to comply with all laws and thus cannot form the basis of a fraud claim. *See Hi-Way Motor Co.*, 247 N.W.2d at 816. Finally, the assurances in the August 12, 2002 letter from Dan Hogan of OAOA (Pls. Ex. J) that Wayne Pearson had acted in good faith and had lived up to all his obligations related to the Dodge sponsorship and offering to provide whatever documentation was necessary to prove that he had fulfilled the requirements of the Dodge OAOA agreement, relate to the alleged non-performance of promises contained in the contract and thus cannot form the basis of a fraud claim.

Moreover, to the extent the 2003 invoices were for contract services to be performed in the future, they cannot form the basis of a fraud claim. *See Hi-Way Motor Co.*, 247 N.W.2d at 816. To the extent the 2003 invoices (Pls.' Ex. B) were not paid, Plaintiffs cannot show that they acted in reliance on them. This too is an essential element of a fraud claim.

Likewise, because Plaintiffs have not shown that payments were made in reliance on Pearson's April 17, 2003 letter (Pls.' Ex. F), they cannot use this letter to form the basis of a fraud claim.

Third, there is no evidence supporting Plaintiffs' claims of silent fraud. As the Michigan Court of Appeals recently observed, silent fraud "or fraudulent concealment, is a commonly asserted, but frequently misunderstood doctrine. This is primarily because most fraud claims are based upon alleged affirmatively stated false representations of material fact. A claim of 'silent fraud' requires a plaintiff to set forth a more complex set of proofs." *M & D, Inc. v. McConkey*, 585 N.W.2d 33, 37 (Mich. Ct. App. 1998). Under Michigan law, "silence cannot constitute actionable fraud *unless* there was a legal duty of disclosure." *Id. Accord, Hord v. Environmental Research Institute of Michigan*, 617 N.W.2d 543, 550 (Mich. 2000). "[A] legal duty to make a disclosure will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Id.* Plaintiffs fail to identify or present evidence of the alleged "repeated inquiries" to which they claim Defendants failed to respond and/or concealed material facts. Accordingly, they fail to establish a legal duty of disclosure. They establish only that Defendants had legal duties arising out of the parties' contract and failed to disclose that they breached that contract by failing to print the promised 200,000 copies of the Almanac.

Despite Plaintiffs' arguments to the contrary, they have not established that Defendants owed them a duty separate and distinct from their contract. Unlike the cases Plaintiffs rely upon, there is no evidence here that, <u>before the transaction was consummated</u>, Defendants had information that would render untrue or misleading any

14

previous representations made to Plaintiffs, which at the time made were true or believed to be true. Accordingly, Plaintiffs' reliance on *Strand v. Librascope, Inc.*, 197 F. Supp. 743, 754 (E.D. Mich. 1961); *U.S. Fidelity & Guaranty Co. v. Black*, 313 N.W.2d 77, 89 (Mich. 1981); *Wolfe v. A.E. Kusterer & Co.*, 257 N.W. 729 (Mich. 1934); and 3 *Restatement (Second) of Torts*, 2d § 551(2)(c) is misplaced. Rather, Plaintiffs' evidence establishes only a duty and a failure to perform that is inextricably tied to the parties' contract. Thus, Plaintiffs have not met the threshold requirement of establishing a duty that Defendants owed them separate and distinct from their contractual duties. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' fraud claims.

Plaintiffs also argue that its fraud claims against Defendant Pearson individually are separate and distinct from the contractual relationship with WP Productions. They argue that Pearson personally assured Plaintiffs that WP Productions had performed under the contract, knowing at the time that his representations were false.

Under Michigan law, it is well-established that "the agents and officers of a corporation are liable for torts which they personally commit, even though in doing so they act for the corporation, and even though the corporation is also liable for the tort. *See Hartman & Eichhorn Bldg. Co., Inc. v. Dailey*, 701 N.W.2d 749, 752 (Mich. Ct. App. 2005) (citing cases), *lv. gtd.,* 712 N.W.2d 724 (Mich. 2006) (to address whether residential builders are subject to the Michigan Consumer Protection Act). Nonetheless, for the reasons stated below, Plaintiffs' fraud claims against Defendant Pearson individually are likewise dismissed. The January 2001 email (Pls.' Ex. D) and March 18, 2003 letter (Pls. Ex. E) Defendants rely on are communications from Mr. Hogan, acting on behalf of OAOA and/or WP Productions. They are not representations made by Defendant Pearson personally

15

and thus cannot form the basis of fraud claims against him individually. Moreover, because Plaintiffs have not shown that payments were made in reliance on Pearson's April 17, 2003 letter (Pls.' Ex. F), they cannot use this letter to form the basis of a fraud claim. Finally, because the "New Vendor Authorization" form signed by Pearson on behalf of OAOA on May 22, 2002 (Pls. Ex. I), contains future promises to perform all services under the parties' contract at the "highest level of integrity" and to comply with all laws, it cannot form the basis of a fraud claim. *See Hi-Way Motor Co.*, 247 N.W.2d at 816.

### 2. Plaintiffs' Claims of Conspiracy to Defraud

As discussed above, Plaintiffs claims of fraud are properly dismissed. Because Plaintiffs have not presented evidence establishing claims of fraud, they cannot establish a conspiracy to defraud. Accordingly, Plaintiffs' civil conspiracy claims are also properly dismissed.

### 3. Conversion Claims

The Court now addresses Plaintiffs tort claims of conversion. Plaintiffs allege claims of common-law and statutory conversion. Specifically, they allege that, contrary to their contractual obligations, Defendants intentionally destroyed, refused to distribute, and refused to surrender Almanacs that belonged to Plaintiffs. (Pls.' First Am. Compl. ¶¶ 53-58.) Defendants' motion argues that Plaintiffs have not come forward with evidence supporting their claims of common-law and statutory conversion. Rather, Plaintiffs' evidence supports only a breach of contract claim. This Court agrees.

Michigan common law defines conversion as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992). Contrary to their

arguments here, Plaintiffs have not shown that the parties' contract granted them a property interest in the Almanacs that WP Productions promised but failed to print and distribute. Contrary to the decisions Plaintiffs' rely on, the evidence presented here shows that Defendants did have permission to use DaimlerChrysler's copyrights and trademarks in the printed Almanacs. On close examination, it becomes evident that Plaintiffs present only evidence showing that Defendant WP Productions breached its contract by failing to print and distribute the promised 200,000 copies of the Almanac for each contract year.

Plaintiffs' claims of statutory conversion likewise fail. "Statutory conversion . . . consists of knowingly 'buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property.' MCL 600.2919a." *Campell v. Sullins*, 667 N.W.2d 887, 896 (Mich. Ct. App. 2003) (quoting *Head v. Phillips Camper Sales Rental, Inc.*, 593 N.W.2d 595, 603 (Mich. Ct. App. 1999)). The Michigan courts have determined that this statute does not "provide a remedy against the individual who has actually stolen, embezzled, or converted the property." *Id.* (internal quotes and citation omitted). Similar to the plaintiff in *Campbell*, Plaintiffs here do not claim or present evidence showing that Defendants received converted property. Rather, Plaintiffs claim that it was the Defendants that converted the property in the first instance. Accordingly, Plaintiffs fail to establish a claim for statutory conversion.

### C. Plaintiffs' Claims of Unjust Enrichment

Defendants next argue that Plaintiffs claims of unjust enrichment must be dismissed because Michigan law does not recognize such claims when an express contract covers the same subject matter. This Court agrees.

17

In their Complaint, Plaintiffs allege that Defendants were unjustly enriched when they received payment for services they were contractually obligated to perform but failed to do so. (Pls.' First Am. Compl. ¶¶ 34-36.) Their Response brief makes the same argument. (Resp. at 11.) In essence, Plaintiffs ground their unjust enrichment claim on their argument and evidence that Defendant WP Productions breached its contract with them. Under Michigan law, the courts "will imply a contract in order to prevent unjust enrichment." *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003). They will do so, however, "only if there is no express contract covering the same subject matter." *Id. Accord Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 818 (6th Cir. 1996) (observing that "[w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and unjust enrichment."). Here, the parties do not dispute that an express contract exists covering WP Productions' obligation to print 200,000 Almanacs in each contract year. Accordingly, Plaintiffs' claims for unjust enrichment are properly dismissed.[4]

### D. Plaintiffs' RICO Claims

Plaintiffs argue that Defendant Pearson, in combination with OAOA, controlled and manipulated WP Productions (an "enterprise") in order to defraud Plaintiffs by collecting money as compensation for services WP Productions never performed, and thus violated

---

[4] For the same reasons, Defendants' unjust enrichment claims (2nd Am. Counter-Compl., Count IV) are properly dismissed.

Defendants' claims for punitive damages (*Id.*, Count III) are also properly dismissed because punitive damages are not available under Michigan law. Rather, that State's laws provide for exemplary damages in narrow circumstances not presented here.

RICO. (Resp. at 14.) Plaintiffs' RICO claims are premised on their fraud claims. They argue that Defendants committed mail fraud and wire fraud when they invoiced Plaintiffs for services they did not perform. (Resp. at 14.) As discussed above, Plaintiffs have not presented evidence showing that Defendants are liable for fraud. Without that, Plaintiffs cannot establish their RICO claims. Accordingly, these claims are also properly dismissed. Defendants' motion is brought pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. (Mot. at 2.) Thus, Plaintiffs' analysis under Rule 12(b)(6) is misplaced. Moreover, in light of this Court's ruling on Plaintiffs' fraud claims, any motion for leave to amend its RICO claims based on fraud would be futile. (*See* Resp. at 20.)

### IV.  Conclusion

For the above-stated reasons, this Court GRANTS IN PART AND DENIES IN PART Defendants' motion for partial summary judgment and Plaintiffs' cross-motion for summary judgment. Plaintiffs' cross-motion for summary judgment is GRANTED as to the liability portion of its breach of contract claim and DENIED as to the remaining claims. Defendants' motion for partial summary judgment is GRANTED as to Plaintiffs' claims for fraud, civil conspiracy, common-law and statutory conversion, and RICO and DENIED as to Plaintiffs' claims for breach of contract.

By virtue of this Court's rulings, the only issue remaining in this case is the amount of damages owed Plaintiffs for Defendant WP Productions' breach of the parties contract, including the amount to be offset for money Plaintiffs promised to pay Defendants in the April 16, 2003 letter (Defs. Ex. P).

      s/Nancy G. Edmunds                          

       Nancy G. Edmunds
       United States District Judge

Dated: July 20, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 20, 2006, by electronic and/or ordinary mail.

       <u>s/Carol A. Hemeyer</u>
       Case Manager